UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| James McHugh Construction Co., | |
| Plaintiff, | Case No. 1:14-cv-02399 |
| v. | |
| International Fidelity Insurance Co., | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James McHugh Construction Company ("McHugh") initiated this breach of contract action against Defendant International Fidelity Insurance Company ("IFIC") in the Circuit Court of Cook County on March 21, 2014. Compl. [1-1] at 6. IFIC removed the case to this Court on April 3, 2014 [1], and fact discovery was completed by July 8, 2015 [52].

The parties have filed cross-motions for summary judgment [59, 62] on the limited question of whether McHugh's claim against IFIC is time-barred. As explained below, disputed factual issues remain regarding the date the applicable claims accrued; accordingly, both motions are denied.

**I.   Background**[1]

This case arises out of the construction of two condominiums at 600 North Lake Shore Drive in Chicago, Illinois. PSOF ¶ 1. McHugh was the general

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to the IFIC's statement of undisputed facts [61], with McHugh's responses [72] cited as "R. DSOF." "PSOF" refers to McHugh's statement of undisputed facts [64], with IFIC's responses [71] cited as "R. PSOF."

1

contractor charged with supervising the construction of both condominiums. *Id.* In that capacity, McHugh subcontracted with Builders Architectural Products ("BAP"). *Id.* ¶ 2. BAP was obligated to install windows, doors and related elements at the condominiums. *Id.* The subcontract included a one year warranty on BAP's work, gave McHugh the right to complete BAP's work in the event of a default, and provided for indemnification. *Id.* ¶¶ 3-6. In connection with the subcontract between McHugh and BAP, IFIC issued two performance bonds on October 12, 2006 and June 13, 2007, respectively. *Id.* ¶ 7. The bonds identify IFIC as the surety, BAP as the bond principal, and McHugh as the obligee. DSOF ¶ 6.

Throughout the construction process, BAP failed to meet expectations regarding both the timing and substance of its work. PSOF ¶ 11. BAP's two principle shortcomings pertained to problems with window components and balcony doors. DSOF ¶¶ 8, 13, 26. On August 25, 2007, McHugh provided IFIC with a quality control report outlining problems with BAP's work. PSOF ¶ 20. In that letter, McHugh advised IFIC that BAP was in default "due to their failure to meet the project schedule and their failure to properly complete installation of the subcontract work." *Id.* On August 31, 2007, IFIC expressed its expectation "that [McHugh] and our Principal [BAP] will work together to resolve any outstanding issues." *Id.* ¶ 21; Ex. 6.

Despite IFIC's assurances, McHugh's concerns regarding BAP's performance continued. On April 3, 2008, McHugh again advised IFIC that BAP was failing to meet completion dates or fix its defective work. PSOF ¶ 22. McHugh also informed

2

IFIC that if BAP did not take corrective action McHugh would retain another company in its stead. *Id.* On April 7, 2008, IFIC asked McHugh for more information in order to investigate the matter, reserved its rights, and instructed McHugh to not act without its consent. *Id.* ¶ 23.

As part of IFIC's investigation, on March 16, 2009, IFIC requested information concerning BAP's work on the project. *Id.* ¶ 24. On April 2, 2009, McHugh outlined BAP's various issues and advised IFIC that BAP's performance had been untimely throughout the entire project. *Id.* ¶ 25. Specifically, McHugh informed IFIC that BAP was thirteen months behind the contractually stipulated date for substantial completion of work on the north condominium tower and eight months behind the contractually stipulated date for substantial completion of work on the south condominium tower. *Id.*

On December 31, 2009, McHugh notified BAP that unless BAP completed their work within seven days, McHugh would be forced to retain another contractor to finish the job. *Id.* ¶ 26. McHugh copied IFIC on this correspondence. *Id.*

On January 5, 2010, McHugh notified IFIC that BAP was in default of their contractual obligations. *Id.* ¶ 27. McHugh also advised IFIC that, if BAP did not quickly fix the work, McHugh would have to complete the work and deduct the costs from any remaining amounts owed to BAP. *Id.* McHugh also noted that if the remaining amounts owed to BAP were insufficient to cover the costs of completing BAP's work, McHugh would make a claim under the bonds. *Id.* On January 7,

2010, IFIC once again expressed its expectation "that [McHugh] and our Principal [BAP] will work together to resolve any outstanding issues." *Id.* ¶ 28; Ex. 7.

On January 13, 2010, 600 LSD LLC, the properties' developer, provided McHugh with an inspection list detailing the balcony and window issues. *Id.* ¶ 22. On January 27, 2010, the developer sent another email to McHugh enumerating additional issues with multiple units throughout the project. *Id.* ¶ 24. In early February of 2010, McHugh was notified that the issues identified in the developer's email would be addressed through the project's window and door supplier, Traco. *Id.* ¶ 25. On February 12, 2010, McHugh informed BAP's counsel of defects remaining in BAP's work and stated that these defects possibly reflected either negligence or work left purposefully incomplete. *Id.* ¶ 26. On February 15, 2010, the developer sent yet another list outlining BAP's defects to McHugh. *Id.* ¶ 27.

The developer eventually retained a consultant (Curtainwall Design Consultants, Inc. or "CDC") to inspect BAP's work on the project. PSOF ¶ 29. According to a field report issued by CDC, defects still existed on March 4, 2010, despite BAP's attempts to address the balcony and window issues. DSOF ¶¶ 31-32.

In April of 2010, CDC advised McHugh of additional defects in BAP's work. PSOF ¶¶ 33-43. The parties dispute whether these problems were "new" or related to the overarching BAP issues from 2007-2010. R. PSOF ¶¶ 33-43.

On July 1, 2010, McHugh notified IFIC that if BAP did not commence corrective work by July 9, 2010, McHugh would seek to recover costs from IFIC to complete the remaining work. PSOF ¶ 44. On July 2, 2010, IFIC reserved its rights

4

and asked McHugh for more information to investigate the claim. *Id.* ¶ 45. On July 12, 2010, after BAP failed to begin corrective work, McHugh advised IFIC that arrangements were being made for another contractor to perform the work and that a claim would be made by McHugh under the bonds. *Id.* ¶ 46. On July 13, 2010, McHugh sent IFIC an estimate of the repair costs for the defective work, which totaled $329,728.92. PSOF ¶ 47. In this letter, McHugh reiterated that it would proceed with the corrective work and make a claim under the bonds. *Id.* On July 22, 2010, IFIC responded to McHugh by reserving its rights, questioning the decision to incur repair costs, and disputing McHugh's "currently unliquidated claim" against IFIC. DSOF ¶¶ 36-39; Ex. CC. The parties dispute whether this correspondence in July of 2010 constituted a formal claim by McHugh against IFIC under the bonds. *See, e.g.*, R. PSOF ¶ 47.

BAP continued to work on the project until they walked off the job in October 2010. PSOF ¶¶ 50-51, 54. BAP eventually filed for bankruptcy on March 2, 2011. *Id.* ¶ 54. McHugh completed the process of finishing BAP's work in late 2012. *Id.* ¶ 55. On April 12, 2013, McHugh submitted a claim to IFIC for the cost of completing BAP's work, which totaled $966,338.41. *Id.*

On May 7, 2013, IFIC reserved its rights and asked McHugh for more information in order to investigate the claim. *Id.* ¶ 56. On September 26, 2013, McHugh responded to IFIC's request. *Id.* ¶ 57. In that letter, McHugh stated that IFIC had possessed notice of McHugh's claim since 2007 and that McHugh had

previously provided much of the requested documentation to IFIC in March 2009 and July 2010. *Id.*

On January 17, 2014, IFIC denied McHugh's claim, invoking a statute of limitations defense. DSOF ¶ 42. On March 20, 2014, McHugh responded by initiating this lawsuit against IFIC in the Circuit Court of Cook County, alleging that it was entitled to recovery of $966,338.41 under the bonds plus costs, pre-judgment interest, and attorneys' fees. *Id.* ¶ 44.

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party, and the Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## III. Analysis

The parties' motions for summary judgment essentially dispute which statute of limitations governs McHugh's claim, when McHugh's claim accrued, and whether

any equitable doctrines trump the foregoing legal analysis. The Court will address each issue in turn.

### A. A Four-Year Limitations Period Governs McHugh's Claim

McHugh contends that its claim is subject to a ten-year limitations period pursuant to 735 Ill. Comp. Stat. 5/13-206, which provides that "actions on bonds . . . shall be commenced within 10 years." 735 Ill. Comp. Stat. 5/13-206 ("§ 5/13-206").

Conversely, IFIC argues that McHugh's claim is subject to a four-year limitations period pursuant to 735 Ill. Comp. Stat. Ann. 5/13-214(a), which provides that:

> Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 4 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission. <u>Notwithstanding any other provision of law, contract actions against a surety on a payment or performance bond shall be commenced, if at all, within the same time limitation applicable to the bond principal</u>.

735 Ill. Comp. Stat. Ann. 5/13-214(a) ("§ 5/13-214(a)") (emphasis added).

For the reasons discussed below, the Court concludes that IFIC's position best comports with both controlling canons of statutory interpretation and the intent of the Illinois Legislature.

#### 1. The Specific Governs The General

Since McHugh's claim is made pursuant to two performance bonds, this Court must consider two distinct limitation periods. *Compare* § 5/13-206 (governing actions on "bonds") *with* § 5/13-214(a) (governing actions "against a surety on a . . .

7

performance bond"). Illinois courts confronted with similarly overlapping statutes of limitation have long held that "when two limitations periods [facially] apply to an action, the more specific statute is generally effective." *DeMarco v. Ecklund*, 792 N.E.2d 404, 406 (Ill. App. Ct. 2003).

Here, § 5/13-214(a) is the more specific statute. Not only does it govern the particular industry at issue, it explicitly tracks the factual scenario in this case – a contract action "against a surety on a payment or performance bond." § 5/13-214(a). This specificity trumps the generalized discussion of "bonds" in § 5/13-206.

Privileging the specificity of § 5/13-214(a) over the generalized language of § 5/13-206 also remains consistent with Illinois legislative history. In fact, § 5/13-214(a) was specifically modified in response to rulings from Illinois state courts which followed McHugh's reasoning here. In 1986, the Supreme Court of Illinois determined in *People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.* that a general contractor's surety was subject to the ten-year statute of limitations since "issuance of a performance bond cannot be deemed to be engaging in the design, planning, supervision, observation or management of construction, or construction." 500 N.E.2d 34, 39 (Ill. 1986) (internal quotation omitted). The Court reasoned that because "statutes of limitation are wholly legislative creations . . . the court will not include sureties under the protection of section 13–214(a) in the absence of statutory language to that effect." *Id.*

Shortly after *Hellmuth* was decided, the Illinois legislature responded by implementing specific statutory language "to that effect": "Notwithstanding any

other provision of law, contract actions against a surety on a payment or performance bond shall be commenced, if at all, within the same time limitation applicable to the bond principal." *See* P.A. 85-887, § 1, eff. Nov. 6, 1987.[2] By applying the specific language of § 5/13-214(a) to this case, this Court ensures that the statute of limitations applicable to the surety (IFIC) is coterminous with the statute of limitations which would have been applicable to the subcontracting construction company (BAP).

Our conclusion also remains consistent with *Travelers Casualty & Surety Company v. Bowman*, 893 N.E.2d 583 (Ill. 2008). In *Travelers,* a surety incurred losses under performance bonds after the defendant contractor failed to meet its contractual obligations. *Id.* After paying on the performance bonds, the surety sued the defendant contractor pursuant to a separate indemnification agreement. *Id.* The Illinois Supreme Court determined that § 5/13-214(a) did not govern the surety's claims under the indemnification agreement, because such claims emanated not "from construction-related activity but, rather, from the breach of a contractual obligation to indemnify." *Id.* at 589.

*Travelers* presents the factual inverse of this case. The claims in *Travelers* were made by a surety, pursuant to an indemnification agreement. *Id.* McHugh's claim here is against a surety, pursuant to performance bonds. *See supra* at *4-6. Unlike the indemnification agreements in *Travelers*, these same performance bonds

---

[2] During discussion of the operative bill, State Senator Barkhausen specifically noted that the amendment to § 5/13-214(a) was implemented to prevent situations where "the Statute of Limitations is longer for sureties than it is for construction companies." Def.'s Resp. Pl.'s Mot. Summ. J., Ex. A [70-1].

explicitly concern themselves with "construction-related activity." DSOF, Ex. I, Ex. J. Indeed, the obligations under the bonds are only implicated if BAP fails to perform its "construction-related" tasks. *Id.*

In sum, McHugh brought a breach of contract claim against a surety, pursuant to two performance bonds, and Illinois law provides that "[n]otwithstanding any other provision of law, contract actions against a surety on a payment or performance bond shall be commenced, if at all, within the same time limitation applicable to the bond principal." § 5/13-214(a) (emphasis added). This provision governs here.

### 2. The Limitations Period Applicable To The Bond Principal Is Four Years

Having decided that § 5/13-214(a) provides the operative rule, this Court turns to the question of what "time limitation" was "applicable" to McHugh's claims against the "bond principal" (here, BAP).

BAP possessed a contractual obligation to McHugh to, *inter alia*, install windows and balcony doors at the project condominiums. *See supra* at *2-4. Therefore, the contract between BAP and McHugh ostensibly concerned the "construction of an improvement to real property" within the meaning of § 5/13-214(a). *See Fireman's Fund Ins. Co. v. Rockford Heating & Air Conditioning, Inc.*, 9 N.E.3d 1154, 1160 (Ill. App. Ct.), *appeal denied*, 20 N.E.3d 1253 (Ill. 2014) (explaining that installation of even a temporary ventilation system constituted a "construction of an improvement to real property," as "the determining factor is the totality of the construction" and governing a subcontractor's work under a different

10

rule would achieve a "incongruous result"); *see also Gomez v. Arkema, Inc.*, No. 09-cv-5353, 2014 WL 983198, at *5 (N.D. Ill. Mar. 12, 2014) ("An improvement to real property is an addition to real property amounting to more than mere repair or replacement, and which substantially enhances the value of the property.") (internal citation omitted).

Accordingly, any claims "based upon [the] contract" between McHugh and BAP regarding the "construction of an improvement to real property" should have been "commenced within 4 years from the time [McHugh] knew or should reasonably have known of" BAP's "act or omission." § 5/13-214(a).

### B. The Accrual Date For McHugh's Claims Against BAP Cannot be Resolved At Summary Judgment

McHugh argues that even if its claim against IFIC remains subject to a four-year limitations period, which began to run when its claims against BAP accrued, "that accrual date is still a question of fact, requiring denial of IFIC's motion for summary judgment." Pl.'s Resp. to Def.'s Mot. for Summ. J. [69] 10. Conversely, IFIC insists that McHugh "knew or reasonably should have known that it had a cause of action against Builder's Architectural [and therefore the cause of action had accrued] by 2008." Def.'s Reply in Supp. of its Mot. for Summ. J. [76] 4. McHugh's position is consonant with Illinois case law and the record before the Court.

### 1. A Factfinder Must Determine Whether McHugh Should Have Known That BAP Had "Wrongfully" Caused It Harm In March 2010

To reiterate, § 5/13-214(a) mandates that actions "based upon tort, contract or otherwise against any person for an act or omission of such person . . . shall be commenced within 4 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission." § 5/13-214(a). This provision embodies a discovery rule which "delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Cincinnati Ins. Co v. Tri-State Fire Prot., Inc.*, No. 3:14-cv-86, 2016 WL 492653, at *3 (S.D. Ill. Feb. 9, 2016) (internal quotation omitted). When a party "knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed." *Id.* (internal citation omitted). As the Illinois Appellate Court so crisply explained:

> What may or may not be wrongfully caused [under the discovery rule] is rooted in common sense. If a roof collapses half way through construction, a court can fix the date, as a matter of law, when the injury is known to be wrongfully caused. Some construction defects lend themselves to such a precise finding, as a matter of law. Many do not. For these, fixing a date an injury is known to be wrongfully caused is a question of fact.

*LaSalle Nat. Bank v. Skidmore, Owings & Merrill*, 635 N.E.2d 564, 567 (Ill. App. Ct. 1994). Under the foregoing standard, summary judgment for IFIC is only appropriate if McHugh possessed enough information before March 21, 2010, to

alert a reasonable person to the fact that BAP had "wrongfully" caused McHugh an injury. *Id.*

The record before the Court is not definitive as to what McHugh knew regarding BAP's performance and when. For example, the parties acknowledge that McHugh was at least aware of problems with BAP's performance before March 21, 2010. *See* PSOF, Ex. 14 (McHugh writes to IFIC in April of 2009 regarding BAP's "untimely" performance and "several items of work that require remediation"), Ex. 15 (McHugh writes to BAP in December of 2009 regarding their "continuing failure to correct the defective" work on the project). It is also undisputed, however, that "BAP remained on the Project until October 2010 performing some remedial work." R. PSOF ¶ 50; *see also id.* ¶ 51 ("BAP was in the process of correcting its defective work when it walked off the job."). In addition to remaining on the job until October of 2010, both parties acknowledge that BAP was contractually obligated at that time to "make good" any "fault or defect" in its work after receiving notice of the same from McHugh. *See* PSOF, Ex. 1 at 8.

Upon these undisputed facts, this Court cannot conclude that, as a matter of law, McHugh possessed sufficient knowledge on March 21, 2010, to determine that any harm caused by BAP was "wrongful" within this context. To help explain why, this Court turns to "the nature of the contract and the nature of the breaches." *Hi-Lite Products Co. v. Am. Home Products Corp.*, 11 F.3d 1402, 1408 (7th Cir. 1993).

## 2. Construction Contracts Envision A "Single Endeavor"

Illinois courts have long recognized that in construction contracts, like the subcontract between McHugh and BAP, the undertaking of a contractor is "a single endeavor and the statute of limitations does not begin to run until the completion of that endeavor." *Berg & Associates, Inc. v. Nelsen Steel & Wire Co.*, 580 N.E.2d 1198, 1201 (Ill. App. Ct. 1991); *see also Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 196 (Ill. 2002) ("*Berg,* however, stands only for the proposition that construction contracts are typically considered a 'single endeavor' and that the statute of limitations for claims under the contract does not begin to run until the endeavor is complete."). This common-sense acknowledgment of the iterative nature of construction projects has also been embraced in other jurisdictions. *See, e.g., Hubble v. Lone Star Contracting Corp.,* 883 S.W.2d 379, 381-82 (Tex. App. Ct. 1994) ("[A] construction contract continues until the work is completed by the contractor . . . Limitations begin to run on a continuing [construction] contract at the earlier of the following: (1) when the work is completed; (2) when the contract is terminated in accordance with its terms; or (3) when the contract is anticipatorily repudiated by one party and this repudiation is adopted by the other party.").

Here, the undisputed facts show that in March of 2010, BAP was still working with McHugh pursuant to its contractual obligations. R. PSOF ¶ 50 (undisputed that BAP remained on the job until October 2010). Indeed, the subcontract explicitly contemplated a procedure whereby McHugh would notify

BAP of defects in its work and BAP would return to the project to fix the same. PSOF, Ex. 1. The parties were proceeding according to this procedure (or attempting to) in March of 2010. *See supra* at *2-5. Thus, any injury experienced by McHugh before March of 2010, far from being "wrongful" as a matter of law, was arguably not even a breach of the subcontract at that time. Here, as in *LaSalle National Bank*, the "trier of fact should decide if the information available to [McHugh] before [March 21, 2010], was enough to meet the knowledge requirement" embodied in § 5/13-214(a)'s discovery rule.

The primary case relied upon by IFIC is not to the contrary. In *Johnston v. Tri-City Blacktop, Inc.*, the plaintiff contracted with the defendants to provide paving services at the plaintiff's shopping center. 577 N.E.2d 529, 532 (Ill. App. Ct. 1991). In 1979, the defendants repaired deteriorated pavement they had previously installed pursuant to their contractual obligations, but they walked off the job in 1980. *Id.* at 530. In 1983, the plaintiff complained to the project's architect, who advised the plaintiff that because the parking lot had been in place for so long, it would be difficult to determine the deterioration's cause. *Id.* The owner finally retained an engineer in 1986, who provided a report on the parking lot's deterioration. *Id.* at 532. The trial court ultimately held that "<u>the statute of limitations began to run in April 1983</u> [more than two years after defendants walked off the job] when plaintiff knew or should have known the deterioration of the pavement was unusual and likely actionable." *Id.* (emphasis added). The appellate court affirmed this result. *Id.*

15

Contrary to IFIC's suggestion, *Johnston* confirms our conclusion that the trier of fact should determine whether McHugh had enough information in March 2010 to determine that BAP's conduct was wrongful. Indeed, the court in *Johnston* held that the statute of limitations period did not begin to run until at least two years <u>after</u> the subcontracting defendant had walked off the job. *Id.* As such, this Court concludes that, based upon the record at this point in the proceedings, the general contractor did not necessarily know, as a matter of law, that its subcontractor had "wrongfully caused" an injury when the subcontractor was still performing work pursuant to the "single endeavor" contemplated in the contract.

Any alternative ruling could lead to unreasonable consequences. In fact, under IFIC's proposed approach, a general contractor would be forced to rush to the courthouse every time a subcontractor's work exhibited limited defects, even as the subcontractor worked to remedy the same. Far from treating construction contracts as a "single endeavor," under IFIC's approach every "prudent businessman involved in complex, multi-year construction [would] keep a lawyer at his elbow from the day ground is broken. That may be, in fact, what prudent businessmen do in this era. But the law is not so stern an arbiter." *LaSalle Nat. Bank*, 262 Ill. App. 3d at 900.

**C.   McHugh's Claim Is Not Barred By The Doctrine Of Laches**

IFIC argues that even if McHugh's claim is not technically barred by the governing statute of limitations, it is entitled to summary judgment pursuant to the equitable doctrine of laches. To successfully establish a claim of laches, "a defendant must show both that the plaintiff lacked diligence in presenting its claim

and the defendant was prejudiced as a result of the delay." *Osler Inst., Inc. v. Miller*, 24 N.E.3d 1272, 1278 (Ill. App. Ct. 2015), *appeal denied*, 31 N.E.3d 769 (Ill. 2015). IFIC bears the burden of establishing its laches defense by "a preponderance of the evidence." *United City of Yorkville v. Ocean Atl. Serv. Corp.*, No. 11-cv-1984, 2013 WL 5433429, at *7 (N.D. Ill. Sept. 30, 2013). The Court addresses the elements of laches in reverse order, because it is clear that IFIC was prejudiced by the timing of this lawsuit.

### 1. IFIC Was Prejudiced By McHugh's Delay

The best evidence of IFIC's prejudice comes in correspondence authored by McHugh. In July of 2010, McHugh sent IFIC an estimate for the repair cost of BAP's defective work, which totaled $329,728.92. PSOF ¶ 47. In its next correspondence to IFIC (almost three years later), McHugh submitted a claim under the performance bonds for the cost of completing BAP's work, this time in the amount of $966,338.41. *Id.* ¶ 55. This $636,609.49 difference represents prejudice suffered by IFIC as a result of McHugh's delay in bringing the present action.

IFIC also faces the additional (albeit less quantifiable) prejudice of being forced to litigate factual issues which are between six and nine years old. As discussed *supra*, resolution of the statute of limitations analysis requires a factfinder to determine when McHugh should have known that it had been "wrongfully" harmed by BAP. Adducing evidence on this question will be difficult for IFIC, insofar as BAP was judicially dissolved over five years ago and IFIC was merely the surety on the project. *See supra* at *2-5.

17

## 2. McHugh Did Not Lack Diligence In Bringing This Lawsuit

Nevertheless, IFIC has not established, by a preponderance of the evidence, that McHugh lacked diligence in bringing the present action.

To be sure, McHugh allowed a substantial amount of time to pass between its first letter to IFIC in August of 2007 (PSOF ¶ 20) and the initiation of this lawsuit on March 21, 2014. McHugh, however, was not "sitting on its hands" during this intervening period. McHugh followed the August 2007 correspondence with additional letters regarding BAP's subpar performance in April 2008, April 2009, December 2009, January 2010, and July 2010. PSOF ¶¶ 22, 25-27, 47. The Court credits McHugh's argument that IFIC's responses to these letters "strung McHugh along" insofar as IFIC (1) continually encouraged McHugh to "work with" BAP and (2) repeatedly asked McHugh for more information regarding BAP's performance. PSOF ¶ 21, 23-24, 28, 45, 48, 57. Laches is an equitable defense, and it would not serve equity to allow IFIC to stick its head in the sand at the eleventh hour, after continually exhorting McHugh to work with BAP.

This Court's conclusion is bolstered by the "presumption against the use of laches to shorten the statute of limitations." *Teamsters & Employers Welfare Tr. of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir. 2002); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, –U.S.–, 134 S. Ct. 1962, 1965 (2014) ("[T]his Court has cautioned against invoking laches to bar legal relief."); *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 678 (7th Cir. 2015) ("[W]e have yet to find a case in which an Illinois court has applied laches to bar a breach-of-

contract suit seeking only monetary damages."). Here, this Court is considering a state-law statute of limitations which explicitly governs state-law causes of action. *See supra* at *2-5. Based upon the record here, allowing IFIC to undercut the statute of limitations pursuant to an equitable doctrine would undermine both principles of federalism and the separation of powers.

## IV. Conclusion

McHugh's claim against IFIC is governed by the limitations period applicable to any claims McHugh might have had against the bonds' principal, BAP. The limitations period applicable to McHugh's claims against BAP is four years from the time McHugh knew or should have known of BAP's wrongful act or omission. This Court concludes that whether McHugh knew or should have known that BAP's conduct was "wrongful" in March of 2010 is a fact question unamenable to resolution via summary judgment. Furthermore, the equities here do not support the application of the doctrine of laches. Accordingly, both parties' motions for summary judgment [59, 62] are denied.

IT IS SO ORDERED

Dated: September 29, 2016

Entered:

_____
John Robert Blakey
United States District Judge